1    GLENN D. DASSOFF  (SB# 96809) glenndassoff@paulhastings.com
2    SCOTT H. SIMS (SB# 234148)  scottsims@paulhastings.com
     PAUL, HASTINGS, JANOFSKY & WALKER LLP
3    695 Town Center Drive
     Seventeenth Floor
4    Costa Mesa, CA  92626
     Telephone:  (714)668-6200
5    Facsimile:  (714) 979-1921

6    Attorneys for Plaintiff
     NOVATEL WIRELESS, INC.

**FILED**

2006 DEC 18  PM 3: 09

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  NOVATEL WIRELESS, INC., a Delaware Corporation, | CASE NO. '06 CV 2729  JAH POR |
| 12                  Plaintiff, | **COMPLAINT FOR:** **(1) INTENTIONAL MISREPRESENTATION OF FACT;** |
| 13        vs. | **(2) NEGLIGENT MISREPRESENTATION OF FACT;** |
| 14  SERCOMM CORPORATION, a Taiwanese Corporation, | **(3) BREACH OF WRITTEN CONTRACT;** **(4) BREACH OF IMPLIED** |
| 15                  Defendant. | **COVENANT OF GOOD FAITH AND FAIR DEALING;** |
| 16 | **(5) BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY;** |
| 17 | **(6) BREACH OF THE IMPLIED WARRANTY AGAINST INFRINGEMENT;** |
| 18 | **(7) BREACH OF WARRANTY OF TITLE BASED ON SELLER'S FAILURE TO GIVE GOOD TITLE; AND** |
| 19 | **(8) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.** |
| 20 | |
| 21 | **DEMAND FOR JURY TRIAL** |

17

18

19

20

21

22

23

24

25

26

27

28

**ORIGINAL**

1

## SUMMARY OF ACTION

2

1.     This action arises out of the material harm defendant SerComm

3

Corporation ("SerComm") has caused to the business relationship between plaintiff

4

Novatel Wireless, Inc. ("Novatel"), a leading provider of wireless broadband access

5

solutions for the worldwide mobile communications market, and third-party Vodafone D2

6

GmbH ("Vodafone"), the German division of Vodafone, the world's largest wireless

7

provider.

8

9

## JURISDICTION AND VENUE

10

2.     Diversity jurisdiction is proper under 28 U.S.C. § 1332(a)(2), in that

11

this is an action between a citizen of a State and a citizen of a foreign state.  Novatel is a

12

corporation organized under the laws of the State of Delaware with its principal place of

13

business in San Diego, California, and thus is a citizen of the state of California.

14

SerComm is a corporation organized under the laws of a foreign state, Taiwan, R.O.C.,

15

and has its principal place of business in Taiwan, R.O.C, and thus a citizen of a foreign

16

state.  The amount in controversy is in excess of $75,000, exclusive of interest and costs.

17

3.     Venue is proper in this district under 28 U.S.C. §§ 1391(a) and

18

1391(d) in that a substantial part of the events or omissions giving rise to the claims

19

occurred in the Southern District of California of the United States District Court  (the

20

"Southern District"), a substantial part of property that is the subject of the action is

21

situated in the Southern District, and SerComm is an alien corporation against whom suit

22

may be brought in any district.

23

24

## PARTIES

25

4.     Novatel is, and at all relevant times mentioned herein was, a

26

corporation organized and operating under the laws of the State of Delaware, and having

27

28

COMPLAINT

1  its principal place of business in the City of San Diego in the State of California, which is
2  in the Southern District.

3      5.      Novatel is informed and believes, and based thereon alleges that
4  SerComm is a corporation organized and existing under the laws of Taiwan, R.O.C. with
5  its principal place of business in Taiwan, R.O.C.

6      6.      Novatel is informed and believes, and based thereon alleges, that at
7  all relevant times SerComm was engaged in purposeful contact within the state of
8  California involving the events and omissions giving rise to this action such that the
9  exercise of personal jurisdiction over SerComm in the Southern District comports with
10  fair play and substantial justice.

11      7.      Novatel is informed and believes, and based thereon alleges, that at
12  all relevant times mentioned herein SerComm was also engaged in substantial, continuous
13  and systematic contact within the Southern District such that the exercise of personal
14  jurisdiction over SerComm in the Southern District comports with fair play and
15  substantial justice.

16
17                    **GENERAL ALLEGATIONS**
18                       **THE MCU1200**

19      8.      On March 7, 2005 SerComm and Novatel entered into a purchase
20  agreement (the "Purchase Agreement"), whereby Novatel was granted the option to
21  purchase certain multimedia application console products to be designed by SerComm in
22  accordance with precise, written specifications.  A true and correct copy of the Purchase
23  Agreement is attached hereto as Exhibit A and is incorporated herein by this reference.
24  The terms of the Purchase Agreement controlled any purchase orders Novatel chose to
25  place with SerComm, and which SerComm chose to accept.  Under Section 16.8 of the
26  Purchase Agreement, California law governs.

27      9.      After the parties entered into the Purchase Agreement, Novatel
28  placed certain purchase orders for the manufacture and sale of MCU1200s, and the

purchase orders were accepted by SerComm.  Upon purchasing the MCU1200s from

SerComm, Novatel in turn re-sold the product to a German company, Vodafone, and

Vodafone in turn sold it to consumers as the "Vodafone Talk&Web Box."  The MCU1200

is a custom built product consisting of three principal component sections.  Two

components sections were supplied to SerComm by Novatel and the third section of

component parts, a custom-built WLAN router was supplied by SerComm.  The custom-

built WLAN router component includes "Netfileter/Iptables" and "mtd" software (the

"Source Code").

10.     Unbeknownst to Novatel, and contrary to SerComm's

representations, SerComm did not own the Source Code, but rather had obtained it from a

publicly available source and was using it without complying with the terms of the GNU

General Public License ("GPL").  Thus its use of the Source Code in the MCU1200

allegedly violated German law from the first unit sold and infringed on the intellectual

property rights of one Harald Welte, a German resident.

11.     On March 30, 2006, Mr. Welte's attorney wrote Vodafone, asserting

that the use of the Source Code in the WLAN router included in the product it was selling

(the MCU1200/Vodafone Talk&Web Box) infringed upon his intellectual property rights.

Specifically, Mr. Welte claimed ownership of the Source Code and maintained Vodafone

possessed no license and had no right to use the Source Code because Sections 1 and 3 of

the GPL, requiring, among other things, publishing of the Source Code, had not been

complied with.  On information and belief, section one of the GPL states:

> "You may copy and distribute verbatim copies of the
> Program's source code as you receive it, in any medium,
> provided that you conspicuously and appropriately publish on
> each copy an appropriate copyright notice and disclaimer of
> warranty; keep intact all the notices that refer to this License
> and to the absence of any warranty; and give any other
> recipients of the program a copy of this license along with the
> program."

On information and belief, section three of the GPL states:

> "You may copy and distribute the Program (or a work based
> on it, under Section 2) in object code or executable form under

the terms of Section 1 and 2 above provided that you also do one of the following: a) Accompany it with the complete corresponding machine-readable source code, with must be distributed under the terms of Sections 1 and 2 above on a medium customarily used for software interchange, or, b) Accompany it with a written offer, valid for at least three years, to give any third party, for a charge no more than your cost of physically performing source distribution, a complete machine-readable copy of the corresponding source code, to be distributed under the terms of Sections 1 and 2 above on a medium customarily used for software interchange."

12.     As a result, Mr. Welte claimed violations of the German Copyright Act and the German Civil Code.

13.     SerComm has admitted that it changed the "mtd" software in the Source Code used in the MCU1200. Changes to the "mtd" software made by SerComm included changing the "mtd" module to define the flash map, such as the start address and size of the bootloader, main code, and nvram. SerComm has also admitted that it added the ipsec pass through module to support ipsec pass through.

14.     Novatel is informed and believes and based thereon alleges that SerComm had intentionally and/or negligently violated sections 1 and 3 of the GPL when it sold the MCU1200 to Novatel, and thus SerComm had intentionally and/or negligently violated Mr. Welte's intellectual property rights.

15.     On or about April 4, 2006, Vodafone informed Novatel of Mr. Welte's claim and demanded that Novatel cure these defects because it was unable to sell the MCU1200 until such a cure had been effected. On or about April 4, 2006, Novatel informed SerComm of Mr. Welte's claim and demanded, as Novatel was contractually entitled to do, that SerComm investigate and cure this infringement immediately so that Vodafone could sell the MCU1200. It was made clear to SerComm that Novatel's current and future business with Vodafone could be jeopardized by SerComm's violation of the GPL.

16.     The Purchase Agreement, in Section 12.1, provides three exclusive ways for SerComm to cure intellectual property infringement. It provides SerComm may

1    "either (a) substitute a fully equivalent, fully compatible, non-infringing unit of

2    component(s), (b) modify the infringing component(s) so that it no longer infringes but

3    remains functionally equivalent and fully compatible or (c) if no remedies as mentioned

4    [are] available, [SerComm] is entitled to refund the amounts for the affected Products paid

5    by [Novatel]."

6            17.     Rather than cure infringement in accordance with the exclusive

7    remedies set forth in the Purchase Agreement, on or about April 11, 2006, SerComm

8    represented to Novatel that it would cure the infringement by going outside of the

9    Purchase Agreement and publishing the Source Code within two weeks.

10           18.     In reliance on SerComm's representation, on or about April 13, 2006,

11   Novatel reached a structured settlement with Mr. Welte and Vodafone pursuant to which,

12   among other things, SerComm would post the Source Code by April 27, 2006.  However,

13   on or about April 17, 2006, SerComm informed Novatel that it would not post the Source

14   Code and in fact, SerComm failed to publish the Source Code until, on information and

15   belief, sometime in the first half of June 2006.  In the interim, on May 2, 2006, Vodafone

16   repeatedly informed Novatel that the relationship had been harmed and that it had "lost

17   confidence that Novatel is still in the lead to support [it]."

18           19.     Due to SerComm's failure to timely publish the Source Code,

19   Vodafone was forced to quit selling the Vodafone Talk&Web Box.  Vodafone made clear

20   its displeasure with Novatel, stating that it was "really p….. off."  Sercomm's actions

21   materially harmed Novatel's relationship with Vodafone and SerComm's failures have

22   resulted in the loss of millions of dollars to Novatel.

23                              **MCU1000**

24           20.     Before Novatel placed the purchase orders for the MCU1200, in 2005

25   Novatel placed certain purchase orders for the sale of the MCU1000, and the purchase

26   orders were accepted by SerComm.  The MCU1000, like the MCU1200, was a custom

27   built wireless product consisting of three principal component sections, two supplied by

28   Novatel and one supplied by SerComm.  The MCU1000 was the first and foundational

1  product that SerComm manufactured for Novatel.  Novatel in turn sold the MCU1000s to

2  O2, who in turn sold them to consumers.

3         21.     During the spring of 2005, Novatel discovered that the MCU1000s

4  manufactured by SerComm did not contain the required and essential electrostatic

5  discharge ("ESD") tolerance capacity (the "Defect").  ESD describes the sudden and

6  momentary unwanted electrical currents that may cause damage to electronic equipment.

7  As a result of the Defect, approximately 1 in 3 MCU1000s failed and became entirely

8  inoperable during normal use in the field, irreversibly shutting down while in the hands of

9  the consumer.  Within weeks after the launch of the MCU1000 the Defect was obvious

10  and well-known by SerComm, Novatel, 02, and consumers.  The Defect has resulted in

11  substantial damage to Novatel.

12

13  **FIRST CLAIM FOR RELIEF**

14  (Intentional Misrepresentation of Fact Against Defendant SerComm)

15         22.     Novatel repeats and incorporates by reference the allegations set forth

16  in  paragraphs 1 through 21, inclusive, as if fully set forth herein.

17         23.     On or about April 11, 2006, Ben Lin of SerComm made the

18  following representation to Slim Souissi of Novatel: that it would publish the Source Code

19  within two weeks.  Mr. Lin is the Chief Technology Officer of SerComm and Slim Soussi

20  is the Chief Technology Officer of Novatel.

21         24.     The representations made by SerComm were in fact false. The true

22  facts were that SerComm had no intention of publishing the Source Code within two

23  weeks.

24         25.     When SerComm made these representations, it knew them to be false

25  and made these representations with the intention to deceive and defraud Novatel and/or

26  to induce Novatel to act in reliance on these representations in the manner hereafter

27  alleged, or with the expectation that Novatel would so act.

28

1         26.    Novatel, at the time these representations were made by SerComm,

2  and at the time Novatel took the actions herein alleged, was ignorant of the falsity of

3  SerComm's representations, believed them to be true, and could not in the exercise of

4  reasonable diligence, have discovered SerComm's secret intention.

5         27.    In reliance on these representations, Novatel was induced to and did

6  reach a structured settlement with Mr. Welte and Vodafone which included, among other

7  things, SerComm publishing the Source Code within two weeks, or Novatel otherwise did

8  promise Mr. Welte and/or Vodafone, that SerComm would publish the Source Code

9  within two weeks.

10        28.    Had Novatel known the actual facts, it would not have taken such

11  action.  Novatel's reliance on the SerComm's representations was justified because it had

12  no reason to believe SerComm would knowingly continue to violate Mr. Welte's alleged

13  intellectual property rights and German law.

14        29.    As a proximate result of the fraudulent conduct of SerComm as

15  herein alleged, Novatel's business relationship with Vodafone was materially harmed,

16  resulting in damage to Novatel in an amount in excess of the jurisdictional limit of this

17  Court and to be proven at trial, plus interest at the maximum legal rate thereon.

18        30.    The aforementioned conduct of SerComm was an intentional

19  misrepresentation, deceit, or concealment of a material fact known to SerComm with the

20  intention on the part of SerComm of thereby depriving Novatel of property or legal rights

21  or otherwise causing injury, and was despicable conduct that subjected Novatel to a cruel

22  and unjust hardship in conscious disregard of the Novatel's rights, so as to justify an

23  award of exemplary and punitive damages.

24

25                  **SECOND CLAIM FOR RELIEF**

26        (Negligent Misrepresentation of Fact Against Defendant SerComm)

27        31.    Novatel repeats and incorporates by reference the allegations set forth

28  in  paragraphs 1 through 21, inclusive, as if fully set forth herein.

32.     On or about April 11, 2006, Ben Lin of SerComm made the following representation to Slim Souissi of Novatel: that it would publish the Source Code within two weeks.  Mr. Lin is the Chief Technology Officer of SerComm and Slim Soussi is the Chief Technology Officer of Novatel.

33.     The representations made by SerComm were in fact false. The true facts were that SerComm had no reasonable ground for believing the representation to be true.

34.     When SerComm made these representations, it had no reasonable ground for believing them to be true in that it had no reason to believe SerComm would knowingly continue to infringe on Mr. Welte's alleged intellectual property and to violate German law.

35.     SerComm made these representations with the intention of inducing Novatel to act in reliance on these representations in the manner hereafter alleged, or with the expectation that Novatel would so act.

36. Novatel, at the time these representations were made by SerComm, and at the time Novatel took the actions herein alleged, was ignorant of the falsity of SerComm's representations, believed them to be true, and could not in the exercise of reasonable diligence, have discovered them to be to be false.

37.     In reliance on these representations, Novatel was induced to and did reach a structured settlement with Mr. Welte and Vodafone which included, among other things, SerComm publishing the Source Code within two weeks, or Novatel otherwise did promise Mr. Welte and/or Vodafone, that SerComm would publish the Source Code within two weeks.

38.     Had Novatel known the actual facts, it would not have taken such action.  Novatel's reliance on SerComm's representations was justified because it had no reason to believe SerComm would knowingly continue to violate Mr. Welte's alleged intellectual property rights and German law.

1         39.     As a proximate result of the fraudulent conduct of SerComm as

2 herein alleged, Novatel's business relationship with Vodafone was materially  harmed,

3 resulting in damage to Novatel in an amount in excess of the jurisdictional limit of this

4 Court and to be proven at trial, plus interest at the maximum legal rate thereon.

5

6                            **THIRD CLAIM FOR RELIEF**

7            (Breach of Written Contract Against Defendant SerComm)

8         40.     Novatel repeats and incorporates by reference the allegations set forth

9 in  paragraphs 1 through 21, inclusive, as if fully set forth herein.

10         41.     On or about March 7, 2005 Novatel and SerComm, for valuable

11 consideration, entered into the Purchase Agreement whereby Novatel was granted the

12 option to purchase certain multimedia application console products to be designed by

13 SerComm in accordance with precise, written specifications.

14         42.     Novatel has performed all conditions, covenants, and promises

15 required on its part to be performed in accordance with the terms and conditions of the

16 Purchase Agreement, except those it was excused from performing.

17         43.     SerComm, without justification, breached the Purchase Agreement in

18 a number of respects, including, but not limited to:

19               (a)     delivering products not fit for their stated purpose and use;

20               (b)     failing to timely cure SerComm's violation of the GPL after

21 receiving notice of the alleged infringement;

22               (c)     failing to pay Novatel for $200,000  worth of pieces and parts

23 Novatel supplied to SerComm; and

24               (d)     failing to comply with its obligations under the Purchase

25 Agreement.

26         44.     Novatel has suffered damages as a result of SerComm's above-

27 described failures and breaches of the Purchase Agreement.

28

45.     As a result of SerComm's failures and refusal to abide by the Purchase Agreement, Novatel is entitled to damages in an amount in excess of the jurisdictional limit of this Court and to be proven at trial, plus interest at the maximum legal rate thereon.

## FOURTH CLAIM FOR RELIEF

(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Defendant SerComm)

46.     Novatel repeats and incorporates by reference the allegations set forth in paragraphs 1 through 21, inclusive, as if fully set forth herein.

47.     California law implies a covenant of good faith and fair dealing in the Purchase Agreement, such that neither party can deny or deprive the benefits of the Purchase Agreement to the other.

48.     Novatel has fulfilled its obligation of good faith and fair dealing.

49.     SerComm has acted in bad faith and in breach of the implied covenant of good faith and fair dealing by, among other things, manufacturing the MCU1200 without complying with the GPL, and/or failing and refusing to publish the Source Code in a timely fashion.

50.     As a direct, proximate, and legal result of SerComm's breach of the implied covenant of good faith and fair dealing, Novatel has suffered and continues to suffer loss and general and special damages in an amount in excess of the jurisdictional limit of this Court and to be proven at trial, plus interest at the maximum legal rate thereon.

## FIFTH CLAIM FOR RELIEF

(Breach of the Implied Warranty of Merchantability Against Defendant SerComm)

51.     Novatel repeats and incorporates by reference the allegations set forth in paragraphs 1 through 21, inclusive as if fully set forth herein.

1      52.    During 2005, in accordance with the Purchase Agreement, SerComm

2    sold to Novatel MCU1000s, and Novatel bought those goods from SerComm.

3      53.    During 2005, in accordance with the Purchase Agreement, SerComm

4    sold to Novatel MCU1200s, and Novatel bought those goods from SerComm.

5      54.    SerComm was a merchant with respect to goods of the kind which

6    were sold to Novatel, and there was in the sale to Novatel an implied warranty that the

7    MCU1000s and MCU12000s would be fit for their ordinary and intended purpose, and the

8    design of the MCU1000 and MCU1200 would be free of defects and would be of fair,

9    average and merchantable quality.

10      55.    SerComm breached that warranty implied in the Purchase Agreement

11    in that the design of the MCU1000 did not contain the required and essential ESD

12    tolerance capacity and as a result, the MCU1000s were not fit for their intended and

13    ordinary purposes and were not of fair, average and merchantable quality.

14      56.    SerComm separately breached that warranty implied in the Purchase

15    Agreement in that the design of the MCU1200 included Source Code that, on information

16    and belief, was used in violation of the GPL and German law and as a result, the

17    MCU1200s were not fit for their intended and ordinary purposes and were not of fair,

18    average and merchantable quality.

19      57.    As a result of SerComm's breaches, Novatel did not receive goods as

20    impliedly warranted by SerComm to be free of defects and of fair, average and

21    merchantable quality.

22      58.    Novatel discovered the breach of warranty on the MCU1000 in the

23    summer of 2005 and Novatel promptly notified SerComm of this breach.

24      59.    Novatel discovered the breach of warranty on the MCU1200 on or

25    about April 4, 2006.   Thereafter, and on or about April 4, 2006 Novatel notified

26    SerComm of this breach.

27      60.    As a direct, proximate, and legal result of SerComm's breach of its

28    implied warranty, Novatel suffered and continues to suffer loss and damages in an amount

1    in excess of the jurisdictional limit of this Court and to be proven at trial, plus interest at

2    the maximum legal rate thereon.

3         61.    Novatel has been further damaged as a result of this breach in that,

4    without knowledge SerComm had delivered non-merchantable goods, Novatel sold the

5    MCU1000s to O2 and the MCU1200s to Vodafone, and the sale of the goods by Novatel

6    to O2 and Vodafone materially harmed Novatel's respective business relationships with

7    those parties, resulting in damages to Novatel in an amount to be shown at trial, plus

8    interest at the maximum legal rate thereon.   At all times, including prior to manufacture,

9    SerComm had actual knowledge that Novatel was going to sell the MCU1000s to O2 and

10   the MCU1200s to Vodafone.

11

12                        **SIXTH CLAIM FOR RELIEF**

13        (Breach of the Implied Warranty Against Infringement Against Defendant SerComm)

14        62.    Novatel repeats and incorporates by reference the allegations set forth

15   in  paragraphs 1 through 21, inclusive, as if fully set forth herein.

16        63.    During 2005, in accordance with the Purchase Agreement, SerComm

17   sold to Novatel MCU1200s, and Novatel bought those goods from SerComm.

18        64.    SerComm was a merchant regularly dealing in goods of the kind

19   which were sold to Novatel and, at the time of that sale, warranted to Novatel, by

20   imposition of law, that the goods would be delivered free of the rightful claim of any third

21   person by way of infringement or the like.

22        65.    However, SerComm breached that warranty in that each of the

23   MCU1200s sold, on information and belief, actually infringed on a the intellectual

24   property rights of Harald Welte, the rightful owner of the Source Code, because SerComm

25   failed to comply with the GPL and German law.  As a result of this breach Novatel did not

26   receive delivery of the MCU1200s free of the rightful claim of a third person by way of

27   infringement or the like.

28

66.     Novatel discovered the breach of warranty on the MCU1200 on or about April 4, 2006.   Thereafter, and on or about April 4, 2006 Novatel notified defendant of this breach.

67.     As a direct, proximate, and legal result of SerComm's breach of its implied warranty, Novatel suffered and continues to suffer loss and damages in an amount in excess of the jurisdictional limit of this Court and to be proven at trial, plus interest at the maximum legal rate thereon.

68.     Novatel has been further damaged as a result of this breach in that, without knowledge SerComm had not complied with the GPL and thus that the Source Code in the MCU1200s allegedly infringed on the intellectual property rights of Harald Welte, Novatel sold the MCU1200s to Vodafone, and the sale of infringing goods by Novatel to Vodafone materially harmed the parties' business relationship and Novatel's reputation as a whole, resulting in damages to Novatel in an amount in excess of the jurisdictional limit of this Court and to be proven at trial, plus interest at the maximum legal rate thereon.   At all times, including prior to manufacture, SerComm had actual knowledge that Novatel was going to sell the MCU1200s to Vodafone.

## SEVENTH CLAIM FOR RELIEF

(Breach of Warranty of Title Based on Seller's Failure to Give Good Title Against Defendant SerComm)

69.     Novatel repeats and incorporates by reference the allegations set forth in paragraphs 1 through 21, inclusive, as if fully set forth herein.

70.     In 2005, in accordance with the Purchase Agreement, SerComm sold to Novatel MCU1200s, and Novatel bought those goods from SerComm.

71.     At the time of that sale SerComm warranted to Novatel that SerComm was conveying to Novatel good title to the goods and making rightful transfer of that title to Novatel.

72.     SerComm breached the warranty in that, on information and belief, Harald Welte was actually the true and lawful owner of the Source Code contained within the MCU1200s at the time of their sale to Novatel, and at the time of the sale of the MCU1200s SerComm had no true or lawful title to the Source Code such that it could to rightfully transfer the MCU1200s containing the Source Code to Novatel. As a result, Novatel in fact did not receive good title to the MCU1200s from SerComm nor a rightful transfer of title.

73.     Novatel discovered the breach of warranty on the MCU1200 on or about April 4, 2006.   Thereafter, and on or about April 4, 2006, Novatel notified defendant of this breach.

74.     As a direct, proximate, and legal result of SerComm's breach of its implied warranty, Novatel suffered and continues to suffer loss and damages to Novatel in an amount in excess of the jurisdictional limit of this Court and to be proven at trial, plus interest at the maximum legal rate thereon.

75.     Novatel has been further damaged as a result of this breach in that, without knowledge SerComm had not complied with the GPL and thus the Source Code in the MCU1200s allegedly infringed on the intellectual property rights of Harald Welte, Novatel sold the MCU1200s to Vodafone, and the sale of infringing goods by Novatel to Vodafone materially harmed the parties' business relationship and Novatel's reputation as a whole, resulting in damages to Novatel in an amount in excess of the jurisdictional limit of this Court and to be proven at trial, plus interest at the maximum legal rate thereon.  At all times, including prior to manufacture, SerComm had actual knowledge that Novatel was going to sell the MCU1200s to Vodafone

1

**EIGHTH CLAIM FOR RELIEF**

2    (Intentional Interference With Prospective Economic Advantage Against Defendant

3    SerComm)

4         76.    Novatel repeats and incorporates by reference the allegations set forth

5    in paragraphs 1 through 21, inclusive, as if fully set forth herein.

6         77.    In 2005 and 2006, Vodafone purchased MCU1200s, among other

7    goods, from Novatel.

8         78.    SerComm knew of the above described relationships existing

9    between Novatel and Vodafone in that SerComm directly shipped some of the MCU1200s

10   to Vodafone in Germany. SerComm further knew of the above described relationship

11   between Novatel and Vodafone in that it was told by Novatel that Harald Welte had

12   alleged infringement directly against Vodafone as a result of the Source Code in the

13   MCU1200s not being published.

14        79.    SerComm intentionally interfered with the economic relationship

15   between Novatel and Vodafone by misrepresenting it would publish the Source Code

16   within two weeks of April 11, 2006 and/or by refusing to timely cure its violation of the

17   GPL by timely publishing the Source Code used in the MCU1200.

18        80.    SerComm's interference constituted, among other things, an

19   intentional or negligent misrepresentation and breach of the implied covenant of good

20   faith and fair dealing.

21        81.    As of the date of this Complaint, the economic relationship between

22   Vodafone and Novatel has been materially disrupted.

23        82.    As a proximate result of SerComm's interference and conduct,

24   Novatel has suffered damages in an amount in excess of the jurisdictional limit of this

25   Court and to be proven at trial, plus interest at the legal maximum rate thereon.

26        83.    The aforementioned acts of SerComm, and each of them, were

27   willful and fraudulent. Plaintiff is therefore entitled to punitive damages.

28

1

### PRAYER FOR RELIEF

2 WHEREFORE, Novatel prays for judgment in its favor and against

3 SerComm as follows:

4

### FIRST CLAIM FOR RELIEF

5      1.    For general damages in an amount to be proven at trial but far in

6 excess of the jurisdictional minimum;

7      2.    For special damages in an amount to be proven at trial but far in

8 excess of the jurisdictional minimum;

9      3.    For punitive damages in an amount appropriate to punish SerComm

10 and deter others from engaging in similar misconduct;

11      4.    For costs of suit incurred herein; and

12      5.    For such other and further relief as the court may deem proper.

13

14

### SECOND CLAIM FOR RELIEF

15      1.    For general damages in an amount to be proven at trial but far in

16 excess of the jurisdictional minimum;

17      2.    For special damages in an amount to be proven at trial but far in

18 excess of the jurisdictional minimum;

19      3.    For costs of suit incurred herein; and

20      4.    For such other and further relief as the court may deem proper.

21

22

### THIRD CLAIM FOR RELIEF

23      1.    For compensatory damages in an amount according to proof at trial

24 but far in excess of the jurisdictional minimum;

25      2.    For interest on any monetary judgment awarded, as permitted by law;

26 and

27      3.    For costs of suit; and

28      4.    For such other and further relief as the Court may deem proper.

1   **FOURTH CLAIM FOR RELIEF**

2       1.   For compensatory damages in an amount according to proof at trial

3   but far in excess of the jurisdictional minimum;

4       2.   For interest on any monetary judgment awarded, as permitted by law;

5   and

6       3.   For costs of suit; and

7       4.   For such other and further relief as the Court may deem proper.

8

9   **FIFTH CLAIM FOR RELIEF**

10       1.   For damages in an amount according to proof at trial but far in excess

11   of the jurisdictional minimum;

12       2.   For special damages in an amount to be proven at trial but far in

13   excess of the jurisdictional minimum;

14       3.   For interest on any monetary judgment awarded, as permitted by law;

15       4.   For costs of suit; and

16       5.   For such other and further relief as the Court may deem proper.

17

18   **SIXTH CLAIM FOR RELIEF**

19       1.   For damages in an amount according to proof at trial but far in excess

20   of the jurisdictional minimum;

21       2.   For special damages in an amount to be proven at trial but far in

22   excess of the jurisdictional minimum;

23       3.   For interest on any monetary judgment awarded, as permitted by law;

24       4.   For costs of suit; and

25       5.   For such other and further relief as the Court may deem proper.

26

27   **SEVENTH CLAIM FOR RELIEF**

28       1.   For damages in an amount according to proof at trial but far in excess

-17-   COMPLAINT

1    of the jurisdictional minimum;

2          2.     For special damages in an amount to be proven at trial but far in

3    excess of the jurisdictional minimum;

4          3.     For interest on any monetary judgment awarded, as permitted by law;

5          4.     For costs of suit; and

6          5.     For such other and further relief as the Court may deem proper.

7

8                    **EIGHTH CLAIM FOR RELIEF**

9          1.     For damages in an amount according to proof at trial but far in excess

10    of the jurisdictional minimum;

11          2.     For punitive damages in an amount appropriate to punish SerComm

12    and deter others from engaging in similar misconduct;

13          3.     For interest on any monetary judgment awarded, as permitted by law;

14          4.     For costs of suit; and

15          5.     For such other and further relief as the Court may deem proper.

16

17          Novatel  hereby demands trial by jury

18

19    DATED: December  18 , 2006      GLENN D. DASSOFF

20                                 SCOTT H. SIMS
                                PAUL, HASTINGS, JANOFSKY & WALKER LLP

21

22                                 By:

23                                           GLENN D. DASSOFF

24                                 Attorneys for Plaintiff
                                NOVATEL WIRELESS, INC.

25

26

27

28

EXHIBIT A

## PURCHASE AGREEMENT

This Purchase Agreement ("Agreement") entered into as of this 7th day of March, 2005 ("Effective Date") by and between SerComm Corp., a corporation organized and existing under the laws of Taiwan, R.O.C., and having its principal place of business at 8F, No 3-1, YuanQu Rd., Nankang, Taipei 115, Taiwan, R.O.C. ("Supplier") and Novatel Wireless, Inc. a corporation organized and existing under the law of Delaware, and having its principal place of business at 9645 Scranton Road, San Diego CA 92121 ("Customer", and together with Supplier, the "Parties").

## Recitals

1. Supplier manufactures and sells or licenses certain information technology hardware and software products.

2. Customer desires to have the option to purchase, and Supplier desires to grant Customer the option to purchase from Supplier, certain products pursuant to the terms and conditions of this Agreement.

3. Supplier and Customer desire that Customer shall have option to have Supplier perform certain development and other services pursuant to the terms and conditions of this Agreement.

In consideration of the mutual covenants and premises contained herein the Parties agree as follows:

1. Definitions

1.1    Trademarks" includes all registered or unregistered trademark(s), tradename(s),   servicename(s), logo, marking as such provided by Customer to Supplier and which may be used on the Products under this Agreement.

1.2   "Delivery Date" means the date specified in a Purchase Order for delivery of Products by Supplier to the Customer's designated carrier.

1.3   "Forecast" means the non-binding information supplied by Customer to Supplier on a monthly basis that reflects Customer's estimate of purchase requirements for Products.

1.4   "Lead Time" means the amount of time between when a Purchase Order must be issued by Customer to Supplier and when the Products ordered thereon are required to be delivered

1

pursuant thereto. The lead-time is 18 weeks.

1.5  "Products" shall mean the products listed on Exhibit A hereto that conform to the Specifications as set forth in Exhibit B hereto and at the per unit price set forth on Exhibit A hereto.

1.6  "Specifications" shall mean the specifications for the Products as set forth on <u>Exhibit B</u> , as attached hereto, and as the same may be amended or supplemented from time to time as mutually agreed between the Parties in writing.

1.7  "Intellectual Property Rights" shall mean any patent, trademark, copyright, trade secret or any other intellectual property rights which may be established or procured by applicable laws in any country in the world.

1.8  "Proprietary Parts" shall mean those Product parts required by the Specifications which cannot be used in any other product being manufactured by Supplier or which are otherwise not common components.   The Proprietary Parts and the non-Proprietary Parts required by Supplier to manufacture the Product according to the Specifications are listed on Exhibit B hereto.

1.9  "Written notice" means the notice or notification as such is dispatched by one Party through email, facsimile or letter to the other Party hereto.

2. Development of Product

2.1 Customer and Supplier each acknowledges and agrees that all the Products under this Agreement have been or shall be developed and manufactured according to this Agreement and that at the time of delivery to Customer shall strictly comply with the Specifications provided by Customer. In this regard, any Customer request for addition, modification or changes to the Specifications shall be based on both Parties' mutual written consent that is evidenced by a duly authorized signature of each Party hereto.

3. Customer Trademarks and Packaging

3.1  Customer shall within a reasonable period of time after the Effective Date, provide Supplier with the Trademarks which shall be contained on the Products manufactured and supplied under this Agreement and the necessarily detailed information in connection with the methods and limitations of using such provided Trademarks. Customer hereby grants to

EXHIBIT A PAGE 20

Supplier a limited, non-exclusive, revocable, non-transferable license without the right of sublicense with respect to the Trademarks solely in connection with the manufacture and delivery of the Products to Customer according to this Agreement. No other right, license or use of the Trademarks, either express or implied is hereby granted. This license shall terminate on the termination of this Agreement or upon written notice to Supplier from Customer. Supplier shall obtain no rights to or interest of any kind in any Trademarks or tradenames other than the limited rights to use set out above.

3.2   Supplier agrees not to use any name, marks, logos, designs or artwork that are confusingly similar to the Trademarks.

3.3   Except as otherwise specified in this Agreement or negotiated later and documented in writing, the Products shall be packaged and prepared for shipment in a manner and in compliance with Supplier's current standardized packaging.

4. Order Forecast

4.1   Customer shall provide Supplier with a three-month forward-looking rolling Forecast and update such Forecast on a monthly basis.   The Forecast shall be used only to facilitate Supplier's internal planning requirements and Supplier shall not procure any raw material for use in the Product until Customer duly issues a Purchase Order to Supplier. Unless Customer otherwise explicitly agrees in a manually signed writing to be liable for component procurement, the Parties acknowledge and agree that Customer shall not incur any liability as a result of Supplier's use of the Forecast and therefore any components ordered or acquired by Supplier pursuant to a Forecast shall be made at Supplier's sole option, risk, expense and liability.

5. Purchase Orders and Change, Cancellation

5.1 Purchase Orders.   Each individual Purchase Order shall be initiated by Customer in written or electronically dispatched form referencing the quantity, the Product, applicable price, shipping instructions and delivery dates (a "Purchase Order").   Each Purchase Order shall be required to be signed by the Customer's General Manager or CEO before Supplier shall deem it duly authorized and issued by Customer to Supplier.

For each Customer Purchase Order that Customer issues under this Agreement and that Supplier duly accepts, Supplier hereby agrees that it shall procure only the specific number of component parts as is required to fulfill the specific quantity of Product ordered pursuant to such Purchase

Order. In the event that Supplier procures component parts in quantities greater than the specific quantity of Product ordered pursuant to an accepted Purchase Order, then Customer shall have no liability whatsoever to Supplier or any third party for such excess quantity of component parts. The Parties acknowledge and agree that Supplier shall be entitled to procure component parts for use in the Products only pursuant to a duly authorized and issued Purchase Order.

All Purchase Orders for Products placed by Customer hereunder shall be governed by the terms and conditions of this Agreement. In the event of a conflict between the provisions of this Agreement and the terms and conditions of Customer's Purchase Order or Supplier's acknowledgment or other written communications, the provisions of this Agreement shall prevail.

5.2 Lead-time. Upon receiving a Purchase Order as provided herein, Supplier shall confirm and indicate its acceptance of all the items included in the Purchase Order (including each Product delivery date set forth therein) within seven   (7) working days following receipt thereof.

Unless a Purchase Order is rejected by Supplier, it shall be deemed automatically accepted following such seven 7 working day period.   In the event that parts shortages or other third party delays require the Customer to have to submit Purchase Orders more than 60 working days in advance of the first delivery date thereon, the Parties shall meet and attempt in good faith to mutually agree upon the required additional Lead Time necessary.   In the event the Parties agree that additional Lead Time is necessary, this additional Lead-Time will be applied to all un-submitted Purchase Orders afterwards so long as such additional Lead Time remains necessary in order to timely manufacture and deliver the Product.

Supplier shall provide Customer with the published Lead Times applicable to each part that forms a part of the Product other than the wireless WAN PC Card (as defined below) and the Parties shall agree on a written schedule that sets forth the quantity and timing of Supplier's proposed Proprietary Parts and non-Proprietary Parts purchases to be made in order to fulfill Customer's submitted Purchase Order.   Supplier shall regularly update Customer as to the order delivery status of the Proprietary Parts of the Product and promptly inform Customer in the event that Supplier encounters difficulties or delays in obtaining any such part required for the Product.   Supplier shall use its best efforts to fulfill that orders for the Proprietary Parts and non-Proprietary Parts that Supplier issues to third parties in order to manufacture the Product are cancelable and that after entering into Supplier's inventory, both the Proprietary Parts and non-Proprietary Parts are returnable to such supplier to the extent that Supplier is able to obtain such terms.

EXHIBIT A  PAGE 22

The Parties agree that so lo◼◼s the bill of materials with respec◼ ◼he Product does not change, then the per unit price that Supplier charges Customer for the Product shall not increase.   In addition, in the event that the cost of the Product components decreases as a result of Customer modifications made to the Specifications, then Supplier shall decrease the cost of the Product to Customer on a dollar-for-dollar basis by the dollar amount of the savings realized thereby.

Customer Supply of Wireless Wide Area Network (WAN) PC Cards.   For each Purchase Order that Supplier accepts, Customer shall arrange to provide Supplier with a sufficient number of wireless WAN PC Cards and in sufficient advance time for integration into the Product according to the Specifications.   Legal title to and ownership of the WAN PC Cards shall at all times remain vested in Customer and Supplier shall use commercially reasonable efforts to properly manage and protect such consigned inventory until such times as the WAN PC Cards are integrated into the Product.

5.3 Rescheduling, Changes and Cancellation. Customer shall be permitted to make such rescheduling, changes or cancellations to previously submitted Purchase Orders according to the following terms.

Rescheduling.   Customer shall be permitted to delay the delivery dates on a given Purchase Order, either in whole or in part, from the originally scheduled delivery date but for no more than thirty (30) calendar days after the original delivery date. No Purchase Order may be rescheduled within the 20 calendar day period immediately preceding the applicable delivery date.

Purchase Order Changes.   Supplier and Customer shall cooperate in good faith in the event that Customer desires to accelerate the applicable delivery date or increase the number of units of Product ordered on a particular Purchase Order.

Liability for Purchase Order Cancellation.   In the event that Customer cancels a Purchase Order, Customer shall pay Supplier using the date of cancellation as the date of determination: (i) the full Product price for any finished products or work in process, (ii) the actual cost to Supplier of Proprietary Parts that Supplier has on hand or on order that would otherwise be consumed but for Customer's Purchase Order cancellation and which cannot be cancelled, returned or otherwise mitigated by Supplier, and (iii) the pro-rated portion of the price of the cancelled Purchase Order which relates to Supplier's reasonable handling fees but only to the extent not already recovered by Supplier pursuant to the preceding clause (i) and only to the extent such Purchase Order was cancelled   preceding the Product delivery date. The Parties

EXHIBIT ___A___ PAGE ᗡ3

shall mutually cooperate in the event of a Purchase Order cancellation including, without limitation, exchanging sufficient documentation in order to substantiate the costs or charges that the cancellation may give rise to. Upon payment in full by Customer to Supplier for any Purchase Order cancellation, the title to such cancelled finished Products or work in process shall pass to Customer at Customer's charge.

Engineering and Specification Changes.   Supplier acknowledges and agrees that Customer may under mutual consent request that Supplier's manufacturing process accommodate Customer initiated engineering changes or changes to Customer's previously submitted Specifications.   In such an event, Customer shall submit such proposed changes in writing to Supplier and Supplier shall use its best efforts to accommodate those changes promptly and shall inform Customer in writing in the event that the proper implementation of such changes shall increase the per unit cost of the Product.


6 Testing Procedures

Promptly following the execution and delivery of this Agreement, the Parties shall set forth in writing the testing procedures that shall be used with respect to the Product before it is packaged for delivery to Customer.   Such testing procedures shall at a minimum include a process whereby Supplier and Customer can determine the reason for the Product defect or non-conformity with the applicable Specifications.   In the event that the Parties conclude from the testing that a defective unit is not repairable in a cost effective manner (a "Bone Pile Unit"), Supplier shall ensure that the WAN PC Card contained in the defective Product is set aside for re-use or returned to Customer pursuant to a procedure the Parties mutually agree upon.

7 Title Transfer and Risk of Loss

   7.1   Price Changes.   The per unit price for the Product is as set forth on Exhibit A to this Agreement and includes the cost of manufacturing, testing and customary packaging of the Product sufficient for shipment to Europe and such price may not be changed without the prior written mutual consent of the Parties.

   7.2. The risk of loss in and title to all Products shall transfer to Customer when such Product is delivered to Customer's designated carrier.   Customer shall be entitled to reject such Product within three working days following receipt of such Product if such Product does not conform to the applicable Specifications and to the applicable Purchase Order in which case legal title shall be deemed never to have passed to Customer.

6

8 Delivery And Shipping Schedule

8.1   Time is of the essence with respect to the delivery of the Products by Supplier pursuant to this Agreement.   All shipments shall be F.O.B. Taiwan port (or other terms as mutually agreed to by both Parties).

Delivery of Products shall be pursuant to the schedule set forth in the applicable Purchase Order. Supplier shall give the written notice to Customer with clarified reasons in the event of any delay ascribed to Supplier pursuant to which Supplier is unable to deliver the specified Products according to the shipping schedule as stated in such applicable Purchase Order. In addition to the foregoing notification, Supplier shall use its best efforts to reduce the damages and remedy the delay including without limitation, using at Supplier's sole expense, overtime labor or expedited shipping means in order to minimize the lateness of the Product delivery.

9 Invoicing and Payment and Payment Delay

9.1 Invoices. The invoice will be due and payable thirty (30) days after Customer's receipt of Supplier's invoice which will be generated on or after Customer takes title to Products.

9.2 Payment. All payments for the Products delivered shall made in U.S. Dollars by Customer to Supplier.   Payment for the Products shall be paid by wire transfer to Supplier's appointed bank account.

9.3 Any payment which is past due shall be subject to an additional charge at the rate of one and one half (1-1/2%) percent per month of the outstanding balance due, or the highest rate of interest permitted by applicable law, whichever is less. Portions of any month shall be prorated.

10 Technical Support

At no cost to Customer, Supplier will provide Customer with support for the Products as needed. Supplier will maintain such adequate number of qualified personnel as is necessary to provide timely and knowledgeable maintenance and support service. Customer agrees to be liable for expense in respect of transportation and accommodation incurred by Supplier for fulfillment of the on-site technical support under the request made by Customer.

EXHIBIT A PAGE 25

11 Warranty

11.1 Supplier warrants that the Products under this Agreement (including all the component parts purchased by Supplier) will conform to the applicable Specifications and its material and workmanship will last for a period of Thirty (30) months from the date of delivery ("Warranty period") under normal use. The above-mentioned warranty shall not extend to Product defects caused by Customer's or its end user's misuse, neglect, improper installation or testing, unauthorized attempts to repair, or by accident, fire, lightning or other hazard, or alteration of or to the Products after Supplier's delivery. Promptly following the execution of this Agreement, the Parties shall set forth in writing the applicable return materials authorization process ("RMA Process") that the Parties shall use in the event that Customer seeks to make a claim under this warranty provision.   The RMA Process shall include allocation of shipping costs and expenses, the testing procedures for identifying the Product defect and the required turn around time for repairing defective Product.   The cost for return shipping to the other Party shall be paid by each Party.

11.2 Both Parties represent and warrant that entering into this Agreement will not violate or constitute a breach under any agreement to which such Party is a party either now or hereafter during the term of this Agreement.

11.3 Title to the component part(s) provided by Customer shall be free and clear of all liens, encumbrances, security interest or other adverse interests or claims.

12 Indemnity & Limitation of Liability

12.1 Indemnify

Customer IP Indemnity.   Customer shall indemnify and hold Supplier harmless and will defend Supplier against any actions based on a claim that the Customer Gateway Technology (as defined below), Customer's Pre-Existing Intellectual Property Rights (as defined below) in the Product or the WAN PC Card infringes any Intellectual Property Rights of a third party.

Supplier IP Indemnity.   Supplier shall indemnify and hold Customer harmless and will defend Customer against any actions based on a claim that Supplier's Pre-Existing Intellectual Property Rights contained in the Product or any other of its intellectual property in the Product infringes any Intellectual Property Rights of a third party. Supplier shall, at its expense and option, adopt the following ways exclusive to cure such infringement, either (a) substitute a fully equivalent,

8

fully compatible, non-infringing unit of component(s), (b) modify the infringing component(s) so that it no longer infringes but remains functionally equivalent and fully compatible or (c) if no remedies as mentioned above is available, Supplier is entitled to refund the amounts for the affected Products paid by Customer.

General Indemnity.   Each Party agrees to indemnify and save harmless the other Party, its affiliates, officers, directors, employees, successors and assigns and any of them, from all costs, damages and expenses including reasonable attorneys' fees that the indemnified Party incurs that arise out of or result from injuries or death to persons or damage to property caused by or on account of negligence or willful misconduct by the indemnifying Party or person furnished by the indemnifying Party.

The indemnification provisions hereunder are conditioned on the other Party (i) notifying the indemnifying Party promptly in writing of the claim, (ii) permitting the indemnifying Party to defend, compromise or settle the claim, and (iii) providing all available information, assistance and authority to enable the indemnifying Party to defend, compromise or settle such claim.

12.2 Limitation of Liability. In no event, whether based in contract or tort (including negligence) shall either Party be liable for incidental, consequential, indirect or special damages of any kind or for loss of profits or revenue or loss of business arising out of or relating to this Agreement or the breach thereof, whether or not the Party was advised of the possibility of such damage.

13 Confidentiality

During the term of this Agreement either Party may, from time to time, provide proprietary information to the other Party, or its employees or agents, or either Party or its employees or agents may acquire certain information from the other Party including without limitations the Specifications, the existence of this Agreement and all the terms and conditions of this Agreement ("Confidential Information"). Both Parties and their employees and agents shall treat all such information as confidential, whether or not so labeled or identified, and shall not disclose any part thereof without the prior written consent of the Party. Both Parties shall limit the use and circulation of such information within their own organization and to the extent necessary to perform hereunder. The obligations set forth in this paragraph shall not apply to any information which (a) has been disclosed in publicly available sources of information, (b) is, through no breach by the Party of this Agreement, or its employees or agents, hereafter disclosed in publicly available sources of information, (c) is now in the possession of the Party or its employees without breach of any obligation of confidentiality hereunder, (d) has been or is hereafter rightfully disclosed to the Party or its employees by a third party, but only to the extent

that the use or disclosure thereof has been or is rightfully disclosed by that third party, or (e) is required to be disclosed by applicable law, regulation or judicial authority.

Ownership of Confidential Information.   All Confidential Information of a Party shall remain the exclusive property of such Party, and no right, title or interest in such information shall be conveyed to the other Party by release of such information to it. Each Party agrees to notify the other Party if it becomes aware of any use the other Party's Confidential Information that is not authorized by this Agreement.

## 14 Term and Termination

14.1 <u>Term</u>. This Agreement shall commence as of the Effective Date and continue for a two year period ("Term"), unless terminated under the terms and conditions of this Agreement. After the initial Term, this Agreement will automatically renew for additional 1 year periods. Notwithstanding the foregoing, this Agreement may be terminated, for any reason or for no reason, if one Party provides the other at least one hundred twenty ( 120) calendar days prior written notice of its intent to terminate.   In such event, the Parties shall cooperate in good faith following a notice of termination but before its effective date for purposes of completing any open Purchase Orders and related matters.

14.2 Termination for Cause. Either Party shall have the right to terminate this Agreement for cause as a result of:

14.2.1   <u>Breaches</u>:

(a) the other Party breaches this Agreement in a manner which cannot be cured in which case termination shall be permitted to become effective immediately; or

(b)the other Party breaches this Agreement in a manner which can be cured and such breach remains uncured for <u>thirty (30) days</u> following written notice of breach by the non-breaching Party; or

14.2.2    The filing by or against the other Party of a petition for reorganization or liquidation under the bankruptcy laws or procedures of any applicable jurisdiction; or

14.2.3 The filing by or against the other Party of any other proceeding concerning bankruptcy, insolvency, dissolution, cessation of operations, reorganization of indebtedness, or the like by the other Party. If such proceeding is involuntary and is contested in good faith, this Agreement shall terminate only after the passage of seven (7) days without the dismissal of such proceedings; or

10


EXHIBIT A PAGE 28

14.2.4 The voluntary or involuntary execution upon; the assignment or conveyance to a liquidation agent, trustee, mortgages or assignee whatever sort of description; or the making of any judicial levy against a substantial percentage of the other Party's assets, for the benefit of its creditors; or

14.2.5 The appointment of a receiver, keeper, liquidator or custodian of whatever sort of description, for all or a substantial portion of the other Party's assets;

14.2.6 The termination, dissolution, insolvency or failure in business of the other Party, the distribution of a substantial portion of its assets, or its cessation to continue all or substantially all of its business affairs; or

14.2.7 Causes set forth in Section 16.3 – Force Majeure delaying the other Party's performance for more than one hundred twenty (120) days.

14.3   The termination or expiration of this Agreement shall in no way relieve either Party from its obligation to pay any sums accrued hereunder prior to such termination or expiration. The Parties agree that their respective rights, obligations and duties under Section 3, 9, 12, 13, 14,and 15   shall survive after termination or expiration. Upon termination or expiration of this Agreement, each Party shall, within five (5) days, deliver the other party all of that other party's Confidential Information and copies thereof in his possession, power, custody or control, or at the other Party's option, destroy such and provide a certificate supporting such destruction.

15.   Intellectual Property.

"Customer Gateway Hardware IP" means (i) the industrial design of the Product, (ii) the layout with respect to each printed circuit board design of the Product (including Alpha, Beta and production board spins), (iii) the design of the SIM flex circuit, (iv) the incorporation of an LCD module into a wireless Internet gateway device such as the Product, (v) the concept of the mechanical interlock between SIM access and application of power, (vi) the design and tooling of the Product housing, (vii) the design and tooling of the WAN PC Card bracket, (viii) the design of the button flex circuit, and (ix) the design of the Product packaging.

"Customer Gateway Software IP" means all the object and source code in the Product with respect to (i) the graphical user interface, (ii) the DMAT framework for interface with the WAN PC Card, (iii) the LCD Module and (iv) the Product buttons.

EXHIBIT __A__ PAGE 29

"Customer Gateway Know-How" means techniques, inventions, practices, methods, knowledge, skill, experience relating to the manufacture of the Product which Customer discloses to Supplier under this Agreement.

<u>Pre-Existing Intellectual Property Rights</u>.   All Intellectual Property Rights existing prior to the Effective Date shall remain vested in the Party that owns or holds them immediately prior to the Effective Date (herein, "<u>Pre-Existing Intellectual Property Rights</u>") and neither Party shall have or shall acquire any rights in or to the other Party's Pre-Existing Intellectual Property Rights other than the license rights specifically granted in this Agreement.

<u>Grant of Rights</u>.   Supplier grants to Customer a worldwide, royalty free, fully paid-up, nonexclusive, irrevocable, right and license to use part of Supplier's Pre-Existing Intellectual Property Rights as listed in the Exhibit D and any other of Supplier's Intellectual Property Rights in the Product in connection with the purchase, sale and resale of the Products under the terms and conditions of this Agreement. Supplier further grants to license Customer to use Supplier's Pre-Existing Intellectual Property Rights limited for the purpose of development and of incorporation into the Product for performing this Agreement.

The Parties hereby acknowledge and agree that Customer solely and exclusively owns the Customer Gateway Hardware IP, the Customer Gateway Software IP and the Customer Gateway Know-How (together with any improvements thereto, the "<u>Customer Gateway Technology</u>") and that Supplier has no rights in or to the Customer Gateway Technology.

Supplier hereby covenants that it shall not, either directly or indirectly, and shall not permit any person within its control to, use, reproduce, distribute or create derivative works from Customer's Pre-Existing Intellectual Property Rights or the Customer Gateway Technology for any purpose other than as expressly and specifically set forth in this Agreement. Such covenant shall survive any termination or expiration of this Agreement.

For the sake of clarity, Supplier hereby agrees to assign, and upon creation of any Customer Gateway Software IP, or any part thereof, automatically assigns to the Customer, its successors and assigns, without the need for any further action, ownership of all United States and international copyrights in each part of the Customer Gateway Software IP, insofar as it, by operation of law, may not be considered work made for hire by the Supplier.

<u>Exclusivity</u>.   As consideration for the sum of US $30,000 that Customer paid to Supplier on January 10, 2005 pursuant to Supplier's invoice No. ASA93100401, Supplier hereby covenants and agrees that it shall never sell to anyone other than Customer, either directly or indirectly, the

EXHIBIT A PAGE 30

gateway router that Customer sells as the O2Surf@home Product incorporates wireless wide area networking capabilities. Customer also grants Supplier an exclusive right to manufacture the 02 Surf@home Product while this Agreement is in effect.

## 16. General

16.1   Relationship of the Parties.   Each of the Parties shall at all times during the term of this Agreement act as, and shall represent itself to be, an independent contractor, and not an agent or employee of the other.

16.2 Entire Agreement.   This Agreement, the Exhibits attached hereto, and those several purchase orders issued or to be issued by Customer to Supplier, including without limitation, purchase order NWS 09911, contain the entire understanding between Customer and Supplier with respect to the subject matter hereof, and supersede all other prior agreements, oral or written, between the Parties with respect to the subject matter of this Agreement.   There are no understandings, representations or warranties, of any kind, expressed or implied, not expressly set forth in this Agreement.

16.3 Force Majeure.   Provided that each Party promptly gives notice to the other of such force majeure as is set forth herein, specifying its nature and expected duration, neither party shall be liable for failure to perform its obligations under this Agreement or for any delay in performing them when such failure or delay is caused, directly or indirectly, by fires, floods, drought, riots, accidents, explosions, strikes, or other labor disturbances, wars, shortages of fuel, power or raw materials, seizure under legal process, orders or acts of any government or branch or agency thereof, including, but not limited to, acts of God.   During any such period in which Customer and/or Supplier is unable to perform its obligations by reason of this force majeure provision, the obligations of the Party so affected, shall be suspended or proportionately be reduced, provided that the Party invoking this force majeure provision has made a reasonable, diligent, good faith effort to remedy the force majeure situation.

16.4   Notices. All payments, notices, requests, demands or other communications required or permitted to be given or made under this Agreement shall be in writing and delivered personally or sent by confirmed facsimile, overnight courier or prepaid certified or registered airmail, return receipt requested, duly addressed as follows:
Any notices sent to Supplier hereunder should be sent to:

SerComm Corporation
Add.:   8F, No.3-1, YuanQu St.,

Nan-Kang, Taipei, Taiwan, R.O.C.

Attn.:   Yolanda Liu_____

Tel. No.: +886-2-26553988   ext. 2211

Fax No.: +886-2-26553966_____

E-mail:  Yolanda_liu@sercomm.com____

Any notices sent to Customer hereunder should be sent to:

Add.: Novatel Wireless, Inc.

____9645 Scranton Drive, San Diego CA 92121

Attn.:   VP of Operations

Tel. No.: (858) 320-8800

Fax No.:(858) 812-3414_____

E-mail:  PObright@nvtl.com

With a copy to Novatel Wireless, Inc. Attn: Legal Department at the address listed above.

16.5    Waiver. No failure on the part of any Party hereto to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by any such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.   No express waiver or assent by any Party hereto to any breach of or default in any term or condition of this Agreement shall constitute a waiver of or an assent to any succeeding breach of or default of the same or any other term or condition hereof.   Any waiver of a provision of this Agreement shall be in writing and signed by the waiving Party.

16.6    Severability.   If any term, covenant, condition or provision of this Agreement, or the application thereof to any person or circumstance, shall ever be held to be invalid or unenforceable, then in each such event the remainder of this Agreement or the application of such term, covenant, condition or provision to any other person or any other circumstance (other than those as to which it shall be invalid or unenforceable) shall not be thereby affected, and each term, covenant, condition and provision hereof shall remain valid and enforceable to the fullest extent permitted by law.

16.7    Assignment.   Either Party may not assign or transfer this Agreement, whether in whole or part, or any of its rights or obligations under this Agreement without the prior written consent of the other Party.   Any attempted assignment without such written consent shall be

14

EXHIBIT A PAGE 32

null and void. Notwithstanding the foregoing, a merger, sale, change in control, asset disposition or other such similar corporate transaction at either party shall not constitute an assignment pursuant to this Section 16.7.

16.8   <u>Governing Law</u>. This agreement shall be construed in accordance with, and all disputes hereunder shall be governed by, the laws of the   State of California, United States without regard to its conflicts of laws rules

16.9   <u>Counterparts.</u> This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

16.10    Choice of Language.   The original of this Agreement has been written in English and the governing language of this Agreement shall be English.

16.11    List of Schedule and Exhibits:
<u>Exhibit A</u> Product List & Prices
<u>Exhibit B</u> Procurement Specifications
<u>Exhibit C</u> Proprietary Components List
<u>Exhibit D Supplier's Pre-Existing Intellectual Property Rights</u>

16.12   **Modifications.**   This Agreement shall not be modified or amended in any respect except by a written agreement   manually signed in ink by Customer and Supplier in the same manner as this Agreement is executed and which makes specific reference to this Section 16..

EXHIBIT A   PAGE 33

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives the day and year first above written.


Supplier: SerComm Corporation
Address: 8F, No. 3-1 YuanQu St.,
         NanKang, Taipei 115, Taiwan, R.O.C.

Customer: Novatel Wireless, Inc.
Address: 9645 Scranton Drive,
         San Diego CA 9212, USA


By: _____

Printed Name: Wei Wang

Title: President

By: _____

Printed Name   Patrick O'Bright

Title:   VP


16

EXHIBIT _A_ PAGE 34

**Exhibit A**

**Product List and Price**

Wireless Gateway Router manufactured and fulfilled according to the Specifications on Exhibit B hereto and sold to Customer at a per unit price to Customer as follows:

| Number of Units | Cost per unit |
| --- | --- |
| 1-1600 | $US 105.25 |
| 1601-4000 | $US 107.27 |
| 4001-8050 | $US 105.25 |

17

**Exhibit B**

**Procurement Specifications**

**[Attach final PDD document]**

EXHIBIT A PAGE 36

**Exhibit C**
**Proprietary Components List**
[attach list]

EXHIBIT A PAGE 37

Exhibit D

Supplier's Pre-Existing Intellectual Property Rights

1.  Web pages, such as all htm, java script, css files

2.  CGI set functions, get functions and all action functions, such as save, connect, disconnect.

3.  Some head files(.h file) ,such as nvram lib, upgrade lib, standard head files

## ADDENDUM TO PURCHASE AGREEMENT

This Addendum ("Addendum") is effective as of this 14th day of April, 2005 ("Effective Date") by and between SerComm Corporation., a corporation organized and existing under the laws of Taiwan, R.O.C., and having its principal place of business at 8F, No 3-1, YuanQu Rd., Nankang, Taipei 115, Taiwan, R.O.C. ("Supplier") and Novatel Wireless, Inc. a corporation organized and existing under the laws of Delaware, and having its principal place of business at 9645 Scranton Road, San Diego CA 92121 ("Customer", and together with Supplier, the "Parties").

### Recitals

WHEREAS, the Parties entered into a purchase agreement dated March 7, 2005 (the "Agreement") with respect to the development, purchase and sale of a certain product;

WHEREAS, the Parties now desire to extend to scope of the Agreement to cover an additional product and to have the development, purchase and sale of such additional product covered by all the terms and conditions of the Agreement.

NOW THEREFORE, in consideration of the mutual covenants and premises contained herein the Parties agree as follows:

### Agreement

Section 1.  Definition of Product.  As used in the Agreement, the term Product shall also mean the product listed on Exhibit A to this Addendum, as applicable, and referred to in this Addendum as Product 2.

Section 2.  Definition of Specifications.  As used in the Agreement, the term Specifications shall also mean those Specifications set forth on Exhibit B to this Addendum and applicable to Product 2.

Section 3.   Fax/Data Module.  The Parties hereby agree that references in the Agreement to the WAN PC card shall, in the case of Product 2, also include that certain data/fax module that Customer shall supply to Supplier for Supplier's integration into Product 2.

Section 4.  No other Additions.  The Parties hereby agree that the Agreement remains in full force and effect and other than as expressly set forth in this Addendum, no other modifications or additions are applicable to it.

In Witness Whereof, this Addendum is effective as of the date first written above.

**SUPPLIER**                                              **CUSTOMER**

SERCOMM CORPORATION                   NOVATEL WIRELESS, INC.

By: _____                 By: _____
　　　　　Wei Wang                                          Patrick O'Bright

Title:  President                                          Title:  Vice President & General Manager

EXHIBIT A PAGE 39

## ADDENDUM TO PURCHASE AGREEMENT

This Addendum ("Addendum") is effective as of this 14th day of April, 2005 ("Effective Date") by and between SerComm Corporation., a corporation organized and existing under the laws of Taiwan, R.O.C., and having its principal place of business at 8F, No 3-1, YuanQu Rd., Nankang, Taipei 115, Taiwan, R.O.C. ("Supplier") and Novatel Wireless, Inc. a corporation organized and existing under the laws of Delaware, and having its principal place of business at 9645 Scranton Road, San Diego CA 92121 ("Customer", and together with Supplier, the "Parties").

### Recitals

WHEREAS, the Parties entered into a purchase agreement dated March 7, 2005 (the "Agreement") with respect to the development, purchase and sale of a certain product;

WHEREAS, the Parties now desire to extend to scope of the Agreement to cover an additional product and to have the development, purchase and sale of such additional product covered by all the terms and conditions of the Agreement.

NOW THEREFORE, in consideration of the mutual covenants and premises contained herein the Parties agree as follows:

### Agreement

Section 1. Definition of Product. As used in the Agreement, the term Product shall also mean the product listed on Exhibit A to this Addendum, as applicable, and referred to in this Addendum as Product 2.

Section 2. Definition of Specifications. As used in the Agreement, the term Specifications shall also mean those Specifications set forth on Exhibit B to this Addendum and applicable to Product 2.

Section 3. Fax/Data Module. The Parties hereby agree that references in the Agreement to the WAN PC card shall, in the case of Product 2, also include that certain data/fax module that Customer shall supply to Supplier for Supplier's integration into Product 2.

Section 4. No other Additions. The Parties hereby agree that the Agreement remains in full force and effect and other than as expressly set forth in this Addendum, no other modifications or additions are applicable to it.

In Witness Whereof, this Addendum is effective as of the date first written above.

**SUPPLIER**

SERCOMM CORPORATION

By: _____
        Wei Wang

Title: President

**CUSTOMER**

NOVATEL WIRELESS, INC.

By: _Patrick O'Bright_
        Patrick O'Bright

Title: Vice President & General Manager

EXHIBIT A PAGE 40

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
NOVATEL WIRELESS, INC., a Delaware Corporation

## DEFENDANTS
SERCOMM CORPORATION, a Taiwanese Corporation

**FILED**

**2006 DEC 18  PM 3: 08**

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

**(b)** County of Residence of First Listed Plaintiff : San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
GLENN D. DASSOFF (SBN 96809); SCOTT H. SIMS (SBN 234148)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
695 Town Center Drive, 17th Floor
Costa Mesa, CA 92626
Telephone: (714) 668-6200     Facsimile: (714) 979-1921

Attorneys (If Known)
NANCY L. STAGG
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130

**06 CV 2729    JAH POR**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☒ 370 Other Fraud | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | ☐ 871 IRS—Third Party | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities – | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities – | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332(a)(2)
Brief description of cause:
Plaintiff brings this diversity action for intentional and negligent misrepresentation, breach of contract, and other causes of action.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23
DEMAND $75,000.00 (in excess of)  CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE
December 18, 2006

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 152920   AMOUNT $250   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**ORIGINAL**

SLC 12/18/06

American LegalNet, Inc.
www.USCourtForms.com

```
          UNITED STATES
          DISTRICT COURT
       Southern District of California
            San Diego Division

         # 132920 - A1
       December 18, 2006


   Code      Case #     Qty    Amount

CV006900 3-06-CV-2729          60.00 CN
   Judge  - HOUSTON
CV006400                      100.00 CN
CVS10000                      190.00 CN


   Total->              350.00


FROM: CIVIL FILING
      NOVATEL WIRELESS INC V.
      SIERCOMM CORP
      BCH 67933  SH
```